# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2025

Lyle W. Cayce
Clerk

———————

No. 23-60014

———————

Estela Martiniana Perez-Ordonez; Franck Antony Sales-Perez; Dylan Vampersy Sales-Perez,

*Petitioners,*

*versus*

Pamela Bondi, *U.S. Attorney General*,

*Respondent.*

—————————————————————

Appeal from the Board of Immigration Appeals
Agency Nos. A201 904 996,
A201 904 997, A201 904 998

—————————————————————

Before Richman, Haynes, and Duncan, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:[*]

Estela Pérez-Ordoñez and her sons, Franck and Dylan, are natives and citizens of Guatemala who seek asylum. Their asylum applications were based on Pérez-Ordoñez's membership in her village council and the violence perpetrated against council members after the council resisted Mara

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-60014

18, a gang.  The Board of Immigration Appeals (BIA) found the petitioners ineligible for asylum.  We deny petitioners' petition for review.

## I

Pérez-Ordoñez and her sons entered the United States in April 2019 and were served with notices to appear.  They admitted the allegations in the notices to appear and conceded removability.  The immigration judge (IJ) consolidated their cases.  Pérez-Ordoñez subsequently applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  Her sons were derivatives on her asylum application and filed their own applications based on the same facts.[1]

Pérez-Ordoñez was the only witness at the merits hearing, and the IJ found that she was credible.  Pérez-Ordoñez testified that she and her sons lived in the village of El Merton, which has a population of about 400.  She was a member of El Merton's local development council, the government of the village.  The council dealt with local problems such as power, roads, and water.

El Merton's local development council had approximately thirty members.  It held monthly meetings and met publicly at the village's school.  The council had a certificate listing all its members' names, and it was common knowledge who was on the council.  To vote, council members would sign their names on a certificate, so council members knew how individual members voted on issues.

During a meeting at the end of 2017, the council discussed difficulties Mara 18 was creating.  The gang had been attempting to control the village's

---

[1] We refer to petitioners jointly as "Pérez-Ordoñez," since Franck and Dylan's petitions are dependent on Pérez-Ordoñez's.

sole entry and exit point.  The council also spoke about Mara 18's murder of Francis Ruiz Sales, the cousin of Pérez-Ordoñez's partner.

In March 2018, Saul Lopez, a member of the council, was found dead in the village river.  Pérez-Ordoñez attributed Lopez's death to Mara 18.  She witnessed the police pull Lopez's body from the river and saw that he had marks indicating he had been killed with a machete.  The police placed Lopez's body on the bank of the river and left without asking any questions or investigating.  Because of the police's inaction, the council did not want to involve police in its efforts against Mara 18.  The council instead discussed having council members watch the village's entrance to prevent Mara 18 from controlling it.

In a meeting in December 2018, the council concluded that in light of Lopez's death, the council needed to expel Mara 18 from the village entrance and assign council members to guard the entrance.  Accordingly, the council voted that two to four council members would guard the entrance.  Pérez-Ordoñez voted for that measure and signed her name to the written certificate.  The council effectuated its decision by posting two or three people to stand continual watch at the village entrance.

In early January 2019, Mara 18 shot and killed two council members standing watch.  Pérez-Ordoñez witnessed the killings as she, her sister, and her children were coming back from church.  The night after Mara 18 killed the council members, members of Mara 18 went to Pérez-Ordoñez's house and threatened to kill her.  The gang members said that they would kill Pérez-Ordoñez and her two children because they had witnessed the killings.

A week later, Pérez-Ordoñez fled with her sons to El Boquerón, a village about an hour away from El Merton.  The gang then called Pérez-Ordoñez, threatening that they knew where she was if she tried to speak about the murders.  In fear, she reported the gang to the police.  Despite telling

Pérez-Ordoñez that they were going to investigate, the police did not call Pérez-Ordoñez or otherwise follow up with her. Instead, Mara 18 called her about a month and a half later. They screamed and swore at her and told her they knew she had reported them; they said that if something happened to the gang, they would retaliate against her. Pérez-Ordoñez does not know how Mara 18 learned that she moved, obtained her phone number, or learned that she had reported them to the police.

A week later, Mara 18 called and threatened Pérez-Ordoñez a third time. Because of the gang's threats, Pérez-Ordoñez decided to leave Guatemala and enter the United States. She has two sisters living in Guatemala—her only family remaining there—but she did not consider relocating to live in their village because she thought that would put her sisters at risk. Pérez-Ordoñez fears that if she returns to Guatemala, Mara 18 will kill her and her children.

The IJ determined that Pérez-Ordoñez was ineligible for asylum. She concluded that Pérez-Ordoñez's experiences did not rise to the level of persecution. She also rejected that Pérez-Ordoñez had a well-founded fear of future persecution on account of political opinion or membership in a particular social group (PSG). Among other determinations, the IJ also concluded that Pérez-Ordoñez failed to establish that internal relocation to another part of Guatemala would be unreasonable.

Additionally, the IJ determined that Pérez-Ordoñez was ineligible for withholding of removal, and she also rejected Pérez-Ordoñez's claim under the CAT.

No. 23-60014

## II

Our review is of the BIA's decision, but we may review the IJ's decision to the extent the BIA adopted it.[2]  Here, the BIA explicitly adopted the IJ's decision in full, citing *Matter of Burbano*.[3]  We therefore review the reasons given by both the IJ and the BIA.[4]

Pérez-Ordoñez does not contest the IJ and BIA's findings that (1) she did not establish past persecution, (2) none of her proposed PSGs were cognizable, (3) she is ineligible for withholding of removal, and (4) she is ineligible for CAT relief.  She has therefore abandoned these issues, leaving only her asylum claim based on a fear of future persecution.[5]

To be eligible for asylum, an applicant must establish that, among other things, "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."[6]  Without a showing of past persecution, which Pérez-Ordoñez lacks here, the applicant can establish a well-founded fear of future persecution by showing a subjective fear of persecution that is objectively reasonable.[7]  To prove a well-founded fear of future persecution,

---

[2] *Wang v. Holder*, 569 F.3d 531, 536 (5th Cir. 2009).

[3] 20 I & N Dec. 872, 874 (BIA 1994).

[4] *Wang*, 569 F.3d at 536.

[5] *See Singh v. Sessions*, 898 F.3d 518, 521 (5th Cir. 2018) ("Because [petitioner] does not challenge the denial of CAT relief and withholding of removal, he has abandoned those issues . . . ."); *United States v. Griffith*, 522 F.3d 607, 610 (5th Cir. 2008) ("It is a well worn principle that the failure to raise an issue on appeal constitutes waiver of that argument.").

[6] 8 U.S.C. § 1158(b)(1)(B)(i); *accord Orellana–Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012).

[7] *See Cabrera v. Sessions*, 890 F.3d 153, 159-60 (5th Cir. 2018).

the applicant must show that it would be unreasonable for her to avoid persecution by relocating to another part of her home country.[8]

The BIA's factual conclusion that an applicant is ineligible for asylum is reviewed under the substantial evidence standard.[9] Under that standard, the petitioner has "the burden of showing that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion" to the one she advocates.[10] For the reasons stated below, a reasonable factfinder could conclude Pérez-Ordoñez failed to prove that it would be unreasonable for her to relocate internally within Guatemala to avoid persecution. Accordingly, we deny Pérez-Ordoñez's petition and decline to address other issues raised by petitioners.

## A

The Government argues that Pérez-Ordoñez failed to exhaust her argument before the BIA that internally relocating within Guatemala was unreasonable. This court may review a final order of removal only when "the alien has exhausted all administrative remedies available to the alien as of right."[11] Typically, to satisfy that requirement, a petitioner must have "fairly

---

[8] 8 C.F.R. § 1208.13(b)(2)(ii), (b)(3).

[9] *See Chen v. Gonzalez*, 470 F.3d 1131, 1134 (5th Cir. 2006).

[10] *Orellana–Monson*, 685 F.3d at 518 (quoting *Chen*, 470 F.3d at 1134).

[11] 8 U.S.C. § 1252(d)(1). The Supreme Court recently overruled our precedent that held that § 1252(d)(1) was jurisdictional, holding instead that it is a nonjurisdictional claim-processing rule. *Santos–Zacaria v. Garland*, 598 U.S. 411, 431 (2023). Both this court and the Supreme Court have yet to decide whether it is a mandatory claim-processing rule. *Carreon v. Garland*, 71 F.4th 247, 257 n.11 (5th Cir. 2023); *Gonzalez Hernandez v. Garland*, No. 22-60110, 2023 WL 5995499, at *5 n.4 (5th Cir. Sep. 15, 2023). If § 1252(d)(1) is a mandatory claim-processing rule, this court must enforce a properly raised exhaustion objection by the Government. *See Fort Bend County v. Davis*, 587 U.S. 541, 548-59 (2019).

present[ed] [the] issue to the BIA."[12] To do so, a petitioner must take "some affirmative action" by "'rais[ing],' 'present[ing],' or 'mention[ing]' [the] issue to the BIA."[13] Alternatively, we have also treated an issue as exhausted if the BIA has "addressed [the issue] on the merits," "even if the issue was not properly presented to the BIA."[14]

Pérez-Ordoñez's internal-relocation argument is exhausted because the BIA "address[ed] [that issue] on the merits."[15] The BIA adopted the IJ's decision in full "for the reasons stated therein." By doing so, the BIA adopted the IJ's reasoning on and disposition of the internal-relocation issue.[16] Accordingly, Pérez-Ordoñez's internal-relocation argument is exhausted for purposes of 8 U.S.C. § 1252(d)(1).

## B

"An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so."[17] To determine whether relocation would be reasonable, we consider the totality of the circumstances,

---

[12] *Omari v. Holder*, 562 F.3d 314, 321-22 (5th Cir. 2009), *abrogated on other grounds by, Santos–Zacaria*, 598 U.S. 411.

[13] *Id.*

[14] *Lopez–Dubon v. Holder*, 609 F.3d 642, 644 (5th Cir. 2010), *abrogated on other grounds by, Santos–Zacaria*, 598 U.S. 411.

[15] *See id.*

[16] *See, e.g.*, *Cornejo Paredes v. Garland*, No. 21-60221, 2023 WL 2755580, at *1 (5th Cir. Apr. 3, 2023) ("By adopting the IJ's decision and citing to *Matter of Burbano*, the BIA effectively preserved the IJ's decision for review." (internal citation omitted)).

[17] 8 C.F.R. § 1208.13(b)(2)(ii); *see also Eduard v. Ashcroft*, 379 F.3d 182, 189 (5th Cir. 2004) ("[A] finding of a well-founded fear of persecution is negated if the applicant can avoid persecution by relocating to another party of his home country.").

"including the size of the country of nationality . . . , the geographic locus of the alleged persecution, the size, numerosity, and reach of the alleged persecutor, and the applicant's demonstrated ability to relocate to the United States in order to apply for asylum."[18]  Pérez-Ordoñez "bear[s] the burden of establishing that it would not be reasonable for . . . her to relocate."[19]

The IJ concluded that Pérez-Ordoñez did not establish that relocation within Guatemala would be unreasonable.  Acknowledging that Pérez-Ordoñez moved away from El Merton and continued to receive threats from Mara 18, the IJ nevertheless emphasized that "gang members never threatened [Pérez-Ordoñez] in person nor attempted to harm her during this period."  The IJ also pointed out that Pérez-Ordoñez "relocated only one hour away from where she previously lived."  Further, the IJ reasoned that the evidence "does not suggest that gang members have tried to reach [Pérez-Ordoñez] through her two sisters who still live in Guatemala."  As the IJ recognized, Pérez-Ordoñez testified she did not move in with her sisters because "she believed doing so would endanger them."  But the IJ concluded that Pérez-Ordoñez "failed to explain why it would now be unreasonable for her to live with her sisters after being outside of Guatemala for one and a half years."  The BIA adopted the IJ's opinion without further analysis on this point.

Pérez-Ordoñez argues that it would be unreasonable to expect her to relocate within Guatemala because she was threatened by Mara 18 even after she moved to a new town.  Pérez-Ordoñez highlights that the police took no action when she filed a complaint against Mara 18—and indeed Mara 18

---

[18] 8 C.F.R. § 1208.13(b)(3).

[19] *See* 8 C.F.R. § 1208.13(b)(3)(i); *Munoz–Granados v. Barr*, 958 F.3d 402, 407 (5th Cir. 2020).

learned about the complaint. Pérez-Ordoñez contends that sequence of events implies that Mara 18 "maintained contacts within the police force" or the police was "in collusion with" Mara 18. Accordingly, Pérez-Ordoñez argues that "[i]t would have been useless for [Pérez-Ordoñez] to continue to move from village to village because [Mara 18] would have most certainly found them."

Although Pérez-Ordoñez did relocate to another village and nevertheless received threats, the IJ concluded that Pérez-Ordoñez failed to establish that relocation within Guatemala would be unreasonable because she could live with her sisters. Substantial evidence supports the IJ's conclusion. The record shows that one of Pérez-Ordoñez's sisters was present when Pérez-Ordoñez witnessed Mara 18 murder two El Merton council members, but Pérez-Ordoñez testified that Mara 18 did not "scare" her sister "because they don't live" in El Merton. True, Pérez-Ordoñez testified that she did not consider moving in with her sisters because she did not want to put them in danger. A different factfinder might have agreed that exposing Pérez-Ordoñez's sisters to the risk of gang violence renders moving to their village unreasonable.[20] But because there is no evidence that Mara 18 has a presence in Pérez-Ordoñez's sisters' village, the evidence does not compel finding that moving to their village would be an unreasonable way to avoid persecution. Accordingly, we cannot say that "no reasonable factfinder" could conclude that it would be unreasonable to expect Pérez-Ordoñez to relocate within Guatemala.[21]

_____

[20] *Cf., e.g.*, *Reyes–Hoyes v. Garland*, No. 20-60133, 2023 WL 3075064, at *8-9 (5th Cir. Apr. 25, 2023) (granting a petition for review because the BIA did not address evidence that, having moved and encountered persecutors twice, "economic, social, and familial" factors made the petitioner's third move unreasonable).

[21] *See Orellana–Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012).

No. 23-60014

\*     \*     \*

We DENY the petition for review.